# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. ALAN GRAVETT, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. 12-1008 |
| THE METHODIST MEDICAL CENTER OF ILLINOIS and COMPREHENSIVE EMERGENCY SOLUTIONS, S.C., | ) ) ) ) | |
| Defendants. | ) ) | |

## O R D E R

This matter is now before the Court on Defendant, Methodist Medical Center's ("Methodist")

Motion to Dismiss, and a Motions to Dismiss by Defendant Comprehensive Emergency Solutions

("CES").  For the reasons set forth below, Methodist's Motion to Dismiss [100] is GRANTED, and

CES's Motion to Dismiss [98] is GRANTED.

## BACKGROUND

Plaintiff, Dr. Alan Gravett ("Gravett"), is a former employee of CES.  The complaint was

initially brought as a *qui tam* action alleging violations of the False Claims Act and Illinois False

Claims Act against Methodist, CES, and three other entities in the Northern District of Illinois in

January 2007.  The complaint was filed under seal and remained sealed until October 8, 2010, when

the government declined to intervene, and Judge Holderman ordered the complaint unsealed and

served on the defendants.  For some reason, the complaint was not unsealed, and on October 19,

2010, Gravett filed a motion to unseal the complaint, which was not granted until February 7, 2011.

By this time, the case had been reassigned to Judge Shadur, who granted an extension of time to

serve under Rule 4(m) until July 5, 2011.  Requests for waivers of service and a copy of the

complaint were served on defendants; only two of the other entities entered their appearances in response to the waivers. Gravett's counsel withdrew, and he was given until August 26, 2011 to retain counsel.

On December 2, 2011, Gravett was given leave to file an amended complaint. The First Amended Complaint was filed on December 16, 2011, naming only Methodist and CES as defendants. Given this change in the parties, the action was transferred to this District in January 2012. Gravett was directed to file an amended complaint under seal, and on March 7, 2012, he filed the Second Amended Complaint under seal. For the next two years, the case remained sealed while the government investigated before ultimately deciding not to intervene in February 2014. On April 23, 2014, Gravett was directed to serve the Defendants, and summonses were formally served on May 5, 2014.

Defendants have moved to dismiss this action for Gravett's failure to establish that he is the original source of the allegations or alternatively for failure to plead fraud with sufficient particularity. Gravett has filed his response, and this Order follows.

## LEGAL STANDARD

A complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). That statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). This means that (1) the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests" and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level." EEOC v.

Concentra Health Services, Inc., 496 F.3d 773, 776 (7th Cir. 2007); Twombly, 550 U.S. at 555. Conclusory allegations are "not entitled to be assumed true." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1951-53 (2009) (citing Twombly, 550 U.S. 544 (2007)).

For purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff; its well-pleaded factual allegations are taken as true, and all reasonably-drawn inferences are drawn in favor of the plaintiff. *See* Albright v. Oliver, 510 U.S. 266, 268 (1994); Hishon v. King & Spalding, 467 U.S. 69 (1984); Lanigan v. Village of East Hazel Crest, 110 F.3d 467 (7th Cir. 1997); M.C.M. Partners, Inc. V. Andrews-Bartlett & Assoc., Inc., 62 F.3d 967, 969 (7th Cir. 1995); Early v. Bankers Life & Cas. Co., 959 F.2d 75 (7th Cir. 1992).

## ANALYSIS

The False Claims Act ("FCA") provides both criminal and civil penalties for presenting a false claim for payment against the Government.[1] United States v. Bank of Farmington, 166 F.3d 853, 857 (7th Cir. 1999). The terms of the FCA establish liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .

31 U.S.C. § 3729(a). It also includes a qui tam provision that allows a private party to bring suit to allege fraud upon the Government; if the claim is proven, this party will receive a percentage of the

---

[1] The elements of claims under the Illinois FCA are identical to those under the federal version of the statute and will not be referenced separately.

recovery.  Bank of Farmington, 166 F.3d at 857-58; United States ex rel. Lu v. Ou, 368 F.3d 773, 774 (7th Cir. 2004).

To establish liability, a plaintiff must show: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment and approval; (3) with the knowledge that the claim is false.  United States ex rel. Fowler v. Caremark RX, LLC, 496 F.3d 730, 741 (7th Cir. 2007).  Section 3730(e)(4) of the Act further provides:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A); Bank of Farmington, 166 F.3d at 858.  It is the "original source" requirement that is implicated in these Motions to Dismiss.

This determination involves a three step inquiry: (1) Have the allegations made by the plaintiff been "publicly disclosed"?  (2) If so, is the lawsuit "based upon" or substantially the same as that publicly disclosed information; (3) If so, is the plaintiff an "original source" of the information?  Id. at 859, citing Cooper v. Blue Cross and Blue Shield of Florida, Inc., 19 F.3d 562, 565 (11th Cir. 1994); Glaser v. Wound Care Consultants, Inc., 570 F.3d 907, 913 (7th Cir. 2009); Fowler, 496 F.3d at 736.  "The jurisdictional bar arises only if the information upon which the qui tam claim is based has been publicly disclosed and the plaintiff was not the original source of the information."  Bank of Farmington, 166 F.3d at 859, citing Hindo v. University of Health Sciences/The Chicago Medical School, 65 F.3d 608, 613 (7th Cir. 1995).

Here, Defendants argue that the lawsuit is based upon information that was disclosed to the U.S. Attorney's Office during the government's investigation of this case and two production requests, the first in 2010 and the second in 2012-13 and the analysis of a Government expert. Gravett is a physician who worked in the emergency room at Methodist from 2000-2007; from 2004 to January 1, 2007, he was technically an employee of CES working at Methodist. In the Third Amended Complaint, Gravett includes examples of three separate sets of patients whose treatment he alleges resulted in upcoding and false claims for payment from the Medicare or Medicaid programs. Table 1 identifies patients treated in the Methodist emergency room in 2006, their age, the code assigned by the software, what he believes the code should have been, and his opinion as to why he believes the claim was not medically necessary and therefore fraudulent. The data contained in Table 2 and Chart 3 represents patients who were treated in 2007-2011, after Gravett was no longer employed at Methodist and cannot have been based on his personal observation. Defendants argue that because the specific examples of claims included in the Third Amended Complaint are based on documentation of patient visits received from the U.S. Attorney's office that had been requested from Defendants during the Government's investigation, the information has been publicly disclosed, and Gravett is not the "original source" of the information.

A public disclosure occurs "when the critical elements exposing the transaction as fraudulent are placed in the public domain." Fowler, 496 F.3d at 736. The Seventh Circuit has held that a target's disclosure of information to prosecutors during the government's investigation of the target's business practices "qualifies as a public disclosure of the Relators' allegations," as the U.S. Attorney is the primary legal representative of the Government on a local level and would be responsible for brining claims against the target on this issue. Id., at 736-37. In this respect, it is clear that the data

obtained after Gravett's termination was publicly disclosed and would not have been available to him but for the Government's investigation.

The question then becomes whether the lawsuit is based on this publicly disclosed data. A lawsuit is based upon publicly disclosed information when it describes allegations or transactions that are substantially similar to those already in the public domain. <u>Glaser</u>, 570 F.3d at 910, 920.

> When an FCA relator's allegations are substantially similar to information about an alleged fraud that is already publicly disclosed, the statute permits the relator to avoid the jurisdictional bar only if he has "direct and independent knowledge of the information on which the allegations are based" and "voluntarily provided the information to the Government before filing" a qui tam action.

31 U.S.C. § 3730(e)(4)(B); <u>Glaser</u>, 570 F.3d at 910.

Here, it is not possible for Gravett to have direct knowledge of the specific patients and treatments provided after his termination from employment at Methodist, as he would not have been present to personally observe these situations, and he offers no other basis to support the finding that he had direct knowledge of the data shown in Table 2 and Chart 3. Gravett's allegation that he believes that the fraudulent billing practices that he observed during his employment carried on after his termination does not demonstrate direct or independent knowledge. The information reflected in Table 1, on the other hand, is alleged to be based on Gravett's direct, personal knowledge, as he was present and obtained the medical records underlying this data during the term of his employment. These allegations formed the basis for Gravett's original Complaint filed on January 25, 2007, three years before the U.S. Attorney's Office began its investigation process with Defendants in 2010.

The record supports a finding that Gravett has direct and independent knowledge of the substance of the alleged fraud as supported by the 2006 data in Table 1; he must also have

voluntarily disclosed the information to the Government before filing a qui tam action in order to avoid the jurisdictional bar. Id., at 917. Gravett's Affidavit[2] states that he met with Special Agent Gonzalez of the Federal Bureau of Investigation in Bloomington, Illinois in fall 2006 and provided him with the information upon which this lawsuit is based. Special Agent Gonzalez referred him to the U.S. Attorneys' Office for the Central District of Illinois, and Gravett called that office and provided the same information. Gravett then provided this information by calling a Medicare Fraud hotline around the same time. A written disclosure statement was provided by his attorney to the Government on January 22, 2007, three days before he filed the Complaint in this case. Assuming that the statements in Gravett's Affidavit are true, as the Court must at this stage of the litigation, the requirement that the relator have voluntarily disclosed the information to the Government prior to filing suit would appear to have been satisfied in this case. Defendants' jurisdictional challenge is therefore rejected.

Defendants next argue that the Third Amended Complaint is insufficient to comply with the particularity requirements of Rule 9(b). Under Rule 9(b), the complaint must allege "the who, what, when, where, and how" of the fraudulent conduct. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). In *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir.2006), the Seventh Circuit deemed the complaint sufficient when it identified the person who made the misrepresentation and an inexact description of the time, place, and content (the complaint stated only that the time was late August or early September).

_____

[2] As Defendants note, while the Court is normally not permitted to review documents outside the pleadings in resolving a motion to dismiss, where the issue being addressed is the Court's jurisdiction based on prior public disclosures, the Court may view whatever evidence has been submitted to determine whether subject matter jurisdiction exists. Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 444 (7th Cir. 2009).

Defendants argue that Plaintiffs' complaint fails because it does not plead with sufficient particularity how the false statements were made, namely that false claims were in fact submitted for payment to the government. The Third Amended Complaint alleges that shortly after the implementation of the new computer program: (1) several specified Methodist employees/administrators told Gravett that Methodist purchased the Horizon Clinical Suite program specifically to increase its billings and recovery from government funded health insurance programs; (2) Gravett and other physicians noticed that the program had a tendency to inflate the otherwise applicable CPT codes for both physician and hospital services; (3) the program's "Quick Chart" function generated content into the medical charts that made it appear that a physician had performed compensable services that were not actually performed or were performed by a non-physician; (4) after expressing concerns about the upcoding, Gravett was told by the Co-Directors of CES that they were aware of the situation and that there was no choice but to continue to use the system as instructed as Michael Bryant, Methodist's CEO, mandated the continued use despite his knowledge of concerns that it was being used to upcode; (5) Gravett was told by a Co-Director of CES that they would have to continue using the program as instructed despite their reservations if they wanted to continue working as emergency room physicians at Methodist; (6) concerns continued to be expressed without any changes on the part of Methodist or CES through January 2007, when Gravett was terminated; (7) Methodist and CES promulgated internal guidelines to encourage and demand that physicians utilize the electronic medical record to "upcode" patients to a "4" or "5" code; (8) upcoding practices began as early as 2003 by misrepresenting the severity of services within the emergency room in order to receive higher reimbursement than Defendants would otherwise receive; (9) forms were upcoded by CES for physician services and then Methodist submitted forms which

paralleled the CES forms for hospital services, thereby inflating the value of facility services; (10) the improperly inflated claims resulted in improperly inflated payments being received by Methodist and CES; (11) CES generated a "Lost Charge Analysis" with the knowledge and agreement of Methodist to reflect, per physician, how much billing opportunity was lost when the physician failed to code the patient's chart to the highest service level; (12) the system would prompt the user to add more chart content and/or documentation until the audit level number matched the recommended level on the screen; and (13) physicians were instructed to always select the option for "all other ROS (Review of Systems) obtained and negative" function that automatically populates data to indicate that all body systems were examined regardless of whether they were actually checked or were even marginally relevant to the patient's presenting problem. He includes Table 1, which sets forth a list of patients Gravett has first-hand knowledge of based on his employment in 2006 whose treatment allegedly resulted in upcoding of services. Gravett then baldly alleges that these false claims resulted in payment, in whole or in part, by the United States and State of Illinois through Medicare/Medicaid; there is no indication of the basis for this assertion, which appears to be supposition or conjecture.

Here, the who is generally identified as Methodist and CES, as Gravett's references to individuals refer to persons who directed or participated in the alleged upcoding of patient charts and/or medical records; individuals involved in the billing/claims process are not specifically identified. This is not surprising, as Gravett mostly points to physician and nurse statements, and it would be highly unlikely that these medical providers were involved in the actual submission of bills for payment. The what, where, and when of which he has personal knowledge are patient charts and medical records alleged to have resulted in knowingly false, upcoded charges generated by CES

and Methodist based on specified emergency room visits in 2006. The recipients of these misrepresentations are alleged to be the Medicare and Medicaid programs of the federal and state governments respectively, but it is unclear how Gravett has personal knowledge that allows him to exclude the possibility that Defendants billed private payors or insurance companies for these 16 patients.

Missing are any paticulars regarding the false claims themselves, that is, evidence of any actual billing, invoices, statements ,or requests for payment that incorporated the upcoding and were submitted to the Government to obtain greater reimbursement than Defendants were otherwise entitled. Courts of Appeal are in agreement that unless the relator is in a special position of personal knowledge or involvement in the billing practices of the defendant that affords some indicia of reliability to the allegations, the failure to provide specific information of at least a single false claim that was actually submitted for payment is fatal to a relator's action under the FCA. <u>United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.</u>, 460 F.3d 853, 856 (7th Cir. 2006), *citing* <u>United States ex rel. Quinn v. Omnicare, Inc.</u>, 382 F.3d 432 (3rd Cir. 2004); <u>United Staes ex rel. Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d 1301 (11th Cir. 2002); <u>United States ex rel. Aflatooni v. Kitsap Physicians Serv.</u>, 314 F.3d 995 (9th Cir. 2002). Examples of information to look for could include: "details concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices." <u>United States ex rek, Grant v. Thorek Hospital and Medical Center</u>, 2008 WL 1883454,

at *2 (N.D.Ill. April 25, 2008), *citing* United States ex rel. Karvelas v. Melrose-Wakefield Hospital, 360 F.3d 220, 232-33 (1st Cir. 2004).

In United States v. Lockheed Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003), the Seventh Circuit found that to satisfy Rule 9(b), a plaintiff must allege that defendant said something knowing at the time that the representation was false in order to obtain payment. While it is not always necessary or possible for a relator to produce copies of the actual fraudulent invoices or requests for payment at the outset of the suit, the role played by the relator and/or his exposure to a defendant's billing practices or receipt of payments is significant, and a complaint that amounts to nothing more than a theory that the claims "must have been submitted cannot survive a motion for summary judgment." United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854-55 (7th Cir. 2009)(noting that while relator had not seen any of the invoices or representations actually submitted for payment, he nevertheless had personal knowledge about the shipments and details of payments as a result of his position that provided an indicia of reliability supporting the inference that false claims had in fact been made or payment would not have been received); Crews, 460 F.3d at 856; Clausen, 290 F.3d at 1311 (holding that a plaintiff cannot describe a scheme in detail and then rely on an unsupported belief that claims requesting illegal payments must have been, were likely, or should have been submitted); United States ex rel. Atkins v. McInteer, 470 F.3d 1350 (11th Cir. 2006); United States ex rel. Mastej v. Health Management Associates, Inc., ___ Fed. Appx. ___, 2014 WL 5471925, at *9 (11th Cir. 2014).

To comply with Rule 9(b), an FCA complaint must generally provide "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." United States ex rel.

Grenadyor v. Ukranian Vill. Pharm., Inc., 772 F.3d 1102, 1106 (7th Cir. 2014).  At a minimum, to survive the Motions to Dismiss, Gravett must allege specific details concerning how Defendants submitted false claims to the Government, such as identifying claims, dates, or details of payment, in order to promote the reliable inference that the claims were actually submitted and/or reimbursed by the Government.  Lusby, 570 F.3d at 854; United States ex rel. McGinnis v. OSF Healthcare System, 2014 WL 2960344, at *8 (C.D.Ill. July 1, 2014).

Gravett was employed as an emergency room physician; his involvement was in the area of filling out patient charts; there is no indication that he was responsible for or has other first hand knowledge of Defendants' actual billing practices, submission of claims for payment, or receipt of payments from the Government payors.  While the instructions he was given for using the Horizon system and CES' review of the Lost Charge Analysis could suggest that upcoded billings may have been being prepared, in light of Gravett's lack of involvement in the claims or billing practices of either Defendant, this is akin to a reliance on rumor or innuendo that has been found to lack the indicia of reliability necessary to support a FCA action under Rule 9(b).  Nor can the gap be bridged by first hand knowledge that payments were conditioned on billings being accompanied by certifications of the type alleged to be false and that payments were in fact received from the government payors, as was the case in Lusby.  Gravett does not allege that he had any first hand knowledge of payment details or what payments were actually received.

Alleging generally that the upcoded information in the  medical records resulted in false claim forms or that certain patients treated on certain days had charts that were upcoded for more treatment than was medically necessary does not provide the requisite link to the actual "false claim" submitted to the Government for payment or rule out the possibility that the levels of service

indicated by physicians/nurses on the medical records were reviewed or adjusted by billing personnel prior to being submitted for payment. *See* McInteer, 470 F.3d at 1359, *citing* Clausen, 290 F.3d at 1315; United States ex rel. Miller v. SSM Health Care Corporation, 2014 WL 2801234, at 8 (W.D.Wis. June 19, 2014)(noting that the relator was employed as a coder in a facility where coders submit bills for payment and that she had personal knowledge by patient name and date of seven specific instances of improperly coded bills containing false statements being submitted to Medicare).[3]  Having had three opportunities to provide sufficient detail of his claims, the Court is now of the opinion that Gravett will never be able to do so, and the Motions to Dismiss are granted.

## CONCLUSION

For the reasons set forth above, Methodist's Motion to Dismiss [100] is GRANTED, and CES's Motion to Dismiss [98] is also GRANTED. This matter is now terminated.

ENTERED this 4th day of March, 2015.


                                    s/ James E. Shadid
                                   _____
                                    James E. Shadid
                                    United States District Judge


---

[3] The Court notes that the decision in Miller is not binding precedent, and to the extent that the portion of the decision cited by Gravett interprets Seventh Circuit precedent differently from this Court, the Seventh Circuit opinion speaks for itself.